## *In re* HILTON.

No. 2886.   Decided July 1, 1916.   (158 Pac. 691.)

1. ATTORNEY AND CLIENT—DISBARMENT—POWER OF COURT. Courts having power to admit attorneys to the bar possess an inherent power to disbar them for unworthy behavior, unprofessional conduct, or moral turpitude, independent of any statutory authority.[1]   (Page: 185.)

2. ATTORNEY AND CLIENT—DISBARMENT—GROUNDS. Where the statute makes a good moral character a condition precedent to admission to the bar, the court may disbar an attorney when he forfeits his claim to such character by misconduct of a nature rendering him unfit to be continued in office. (Page 185.)

3. ATTORNEY AND CLIENT—PRIVILEGE OF ATTORNEY—CRITICISM OF COURTS. An attorney may publicly or privately criticize the decision of the court, pointing out wherein he deems it defective, and may state that it should not be final. (Page 185.)

4. ATTORNEY AND CLIENT — RIGHT OF ATTORNEY — FREE SPEECH—ABUSE OF COURT. An attorney cannot, under his constitutional right of free speech, slander or defame a court. (Page 185.)

5. ATTORNEY AND CLIENT — DISCIPLINE OF ATTORNEY — DEFAMING COURT. An attorney guilty of slandering or defaming a court or judge is subject to discipline and disbarment. (Page 185.)

6. ATTORNEY AND CLIENT—IMPROPER CONDUCT—DISBARMENT. Where an attorney, delivering a funeral oration over the body of an executed murderer, venomously attacked the Supreme Court which affirmed the conviction, accusing the court of being improperly influenced by a powerful religious body in the state, charging the court with prejudice and unfairness and garbling the accounts of the trial and of proceedings before the pardon board, the attorney is guilty of professional misconduct which warrants his disbarment under Comp. Laws 1907, Sections 113, 120, respectively, declaring that it is the duty of an attorney to support the Constitution and laws of the United States, to maintain the respect due courts, and employ for the

---

[1]*Morrison* v. *Snow*, 26 Utah 247, 72 Pac. 924; *In re Platz*, 42 Utah 439, 132 Pac. 390.

purpose of maintaining causes confided to him only such means as are consistent with the truth, and that an attorney may be disbarred for any violation of his duties or for moral turpitude, for an attorney who so misrepresented the court, attempting to bring the high judicial office into disrespect, is guilty of moral turpitude.   (Page 185.)

7.  CRIMINAL LAW—OFFENSES—PROOF OF IDENTITY.  The identity of one charged with crime may be established by natural and reasonable inferences, deducible from proven facts, and may rest wholly on circumstantial evidence.  (Page 185.)

In the matter of the charges against Orrin N. Hilton, an attorney.

Respondent disbarred. ·

*C. S. Varian, F. K. Nebeker* and *A. L. Hoppaugh* for Grievance Committee.

*Ira Snyder, Soren X Christensen* for respondent.

STRAUP, C. J.

This is a proceeding instituted by the grievance committee of the State Bar Association to disbar respondent, Orrin N. Hilton, a member of the bar of this court.

It is charged in the information that he is guilty of unprofessional conduct in the particulars that he, in violation of his oath and of his duty as an officer of this court, and with the intent to bring the courts and judges of this State into disrepute, did falsely and maliciously charge that they, in the discharge of their official duties, were subservient to and controlled by a religious power foreign to the laws and the Constitution of the State; exhibited towards them a contemptuous disregard of their authority; imputed to them dishonorable and unlawful motives and acts in the discharge of their official duties, and in furtherance thereof did willfully misrepresent the facts and proceedings of a case had before the courts of this State, wherein the State of Utah was plaintiff, and one Joseph Hillstrom, charged with and convicted of first degree murder, the defendant; and especially did falsely charge and state that this court, through a preponderating and an imponderable and undefined influence of the Mormon

Church, was persuaded to take an attitude of hostility toward Hillstrom, and that the views expressed by this court in that case were but in consonance with the views of the church; and with like purpose and intent, and to bring the administration of the law of this State into disrepute, willfully and falsely misrepresented the proceedings of the case before the state board of pardons, charged the Justices of this court, who, by virtue of their office, are also members of such board, as being with others, responsible for ''false, wicked, and malicious aspersions on Hillstrom's character,'' and falsely and maliciously attributed to such justices as such members dishonest acts and motives. The information is largely predicated on a public address delivered by the respondent in Chicago in funeral rites over the body of Hillstrom and on interviews prepared by himself and at his request published by the local press.

In January, 1914, at ten o'clock at night, two men, with masks over their faces, guns in hand, and for the purpose of robbery or murder, entered a grocery store at Salt Lake City and deliberately shot to death the storekeeper and his son. In the assault one of the assailants himself was shot by the son. Two hours thereafter Joseph Hillstrom was found $2\frac{1}{2}$ miles from the place of the homicide suffering from a serious flesh gunshot wound through the chest, and applying to a doctor for medical aid. Later he was identified as one of the perpetrators of the crime, charged with first degree murder, tried, convicted, and sentenced to death. The respondent, as his chief counsel, prosecuted an appeal to this court. He principally contended that the evidence was insufficient to connect Hillstrom with the commission of the offense or to show motive, and complained of rulings of the trial court respecting spectacular performances of Hillstrom, who, on the trial, without notice or cause, in the presence of the jury and during the progress of the trial, summarily discharged counsel selected and employed by himself, demanded that he be permitted to conduct his own defense in person without counsel, and later consented that they might remain in the case. These matters, on a complete record of all the evidence and of all the proceedings in the cause, were reviewed by us on the ap-

In matter of charges against Orrin N. Hilton.

peal, which resulted in an affirmance of the judgment. *State v. Hillstrom,* 46 Utah 341, 150 Pac. 935. The opinion contains a statement of the facts, the assignments of error relied on, and our reasons for affirming the judgment. No petition for a rehearing was filed, nor was there any claim made before the court, or in any of the proceedings thereof, that the law was misapplied or that the facts were misconceived. On remittitur and resentence an application was made to the state board of pardons, consisting of the Governor, the Attorney General, and the three Justices of this court, for commutation of sentence. In that application Hillstrom was again represented by the respondent. As appears by the official report of that board, put in evidence in this proceeding, all of the stated grounds for commutation of the sentence were included in the assignments of error before the Supreme Court and there adjudged adversely to the respondent's contentions. Nevertheless, and as fully appears by the board's record, Hillstrom and his counsel were given every opportunity to again review the evidence and to present any new matter, or anything additional deemed by them beneficial to Hillstrom's cause. But nothing such was attempted or offered. The official report as to that reads:

"The applicant before judgment was entitled to every presumption of innocence; but, after a verdict finding him guilty and after judgment and its affirmance, the presumption of innocence no longer prevails. The presumption then to be indulged is that the judgment is right and that the applicant is guilty. He, after that, had the burden to show, or bring forward, or point out, something to justify a commutation of sentence, or clemency in his favor. But neither he nor his counsel before the board attempted to point out anything wherein or in what particular they claimed the evidence was insufficient to justify the verdict. Nor did they offer or attempt to show anything respecting the applicant's life, habits, morals, or previous character, or who he was or what he had done, or where he was from, or what kind of life had been lived by him. Nor did they offer or attempt to show anything new or additional respecting the case, or anything in favor of the applicant, or anything to justify commutation or clemency. What was urged in support of the application is this: Cases were referred to wherein we were told convictions rested alone on circumstantial evidence, and where later it was disclosed that the persons convicted were innocent. It, however, was not claimed, nor was there any attempt made

to show that the facts in those cases and in this case were similar or even analogous. Frequent assertions were made by counsel that the conviction rested alone on circumstantial evidence, and that the applicant's life ought not to be taken on that kind of evidence. But, as stated by the Supreme Court in its decision, and as shown by the record, the conviction does not rest on circumstantial evidence alone. There is direct evidence, testimony of eyewitnesses, to identify the applicant as one of the perpetrators of the crime. No reference whatever was made to that testimony by counsel, nor did they in any manner attempt to inform the board wherein or for what reason the conviction rested alone upon circumstantial evidence. Indeed, counsel, before the board, for some reason avoided all reference to the real facts of the case and as disclosed by the record, and in such respect contented themselves with fervid exhortations on the horrors of an execution on circumstantial evidence and with unwarranted assaults on the good name of the states of Utah and Colorado."

The state proved beyond controversy that in the assault one of the perpetrators of the crime was himself shot in the store. When Hillstrom, two hours after the commission of the homicide, suffering from a fresh gun-shot wound, applied for medical aid, he stated to the physician that he was shot "in a quarrel over a woman, in which he was to blame as much as the other fellow, and wished the matter kept quiet." The State proved that statement to show his unsatisfactory or unreasonable explanation of his fresh gun-shot wound. No evidence whatever was given by him at the trial, or before the board of pardons, to show that his wound was received in such manner. Something, however, in argument was attempted to be made of this before the board of pardons, as showing Hillstrom's gallantry in protecting the honor of a woman. As to that the board, in its official report, states:

"Hillstrom's claim to his physician that he received his wound in a quarrel over a woman was but evidence of his declaration. Such an extrajudicial, self-serving, and unsworn declaration would be no evidence of the fact that the wound was caused in such manner. If the applicant claimed that the wound was so produced, it was his duty, and he was afforded full opportunity, to bring forward something to support it. He cannot ask any one to believe his claim with no evidence whatever to support it, and with no effort or attempt even to produce or furnish any. Yet, upon this weird; vague, and self-serving statement, wholly unsupported by

In matter of charges against Orrin N. Hilton.

any evidence, the board was in effect asked to make a finding that the applicant at some undisclosed place was shot in a quarrel over some unknown and undescribed woman, by some unknown and undescribed man, and thus to ignore all the evidence adduced at the trial and shown by the record that he was shot in the store at the time of the homicide."

The report further recites:

"At the conclusion of counsel's argument, without offering anything on behalf of the applicant, he, being present during all the proceedings, was asked if he desired to make any statement, or to say anything on his own behalf. His reply was that he would not give the board any information, nor make any statement, until he was first granted a new trial. He was informed that the board was not clothed with power to grant him a new trial, and that all, by way of favorable action, it could take was to grant a pardon, or commute the sentence. His counsel (respondent) in his (Hillstrom's) presence stated to the board that he also had so advised him and had requested him to make a statement and tell the board whatever he claimed to be the truth about the case, but that he had declined to give any information, or to make any statement, or to answer any question, except on a new trial of the case before a jury, which he had advised him this board was powerless to grant. His counsel were asked if they desired to ask him any questions before the board, or if there was anything they desired to show by him, to which they replied in the negative. The applicant also again stated that until the board granted him a new trial, he was unwilling that any questions be asked him (either by his counsel or any member of the board) or to make answer to any, or to make any statement whatsoever. In no particular was it disclosed, nor attempted to be disclosed, what, if anything, were he granted a new trial, he would or could produce, or prove, nor was even the nature or character of such proof indicated."

The board's record further shows that many letters and telegrams were received by the board, from persons all over the United States, claiming to be members of an organization known as Industrial Workers of the World and of kindred organizations, many of whom, knowing nothing whatever of the facts of the case, and misinformed, misguided, and misdirected by garbled reports and pamphlets prepared and sent out by partisans, threatened the lives of members of the board and the destruction of property within the state unless Hillstrom was pardoned or his sentence commuted, and exalted

him as a martyr and hero, about to die in the cause of industrial liberty and freedom, and that on a suspension of the proceedings to enable counsel to privately confer with Hillstrom, one of them, returning before the board, stated that Hillstrom had nothing to say, and "wanted to die a martyr." It was not disclosed by the record, either in the court below or in this court, that Hillstrom was a member of the Industrial Workers of the World, or of any organization, or that any such a subject in any of the court proceedings was alluded to, or that the jury had knowledge of any such fact. That Hillstrom was tried and convicted by an impartial jury of twelve men, against whom no complaint of prejudice, bias, or unfairness was made, was not questioned by any one in any of the proceedings before either the court below or in this court or before the board.

When commutation of sentence was denied, the respondent caused to be published in the local press an interview in his own handwriting, in which he referred to the board as an "iniquitous system," and otherwise severely criticized it, especially the Justices of the Supreme Court as members thereof, stating:

"They had prejudged the cause and solemly announced that the accused was guilty;  *  *  *  were tenacious of their opinions;  *  *  *  and insistent in their defense of such preconceived judgments.  *  *  *  I had not spoken five minutes before they were all after me in violent and frequently raucous disputation and dissent. At one time three of them were talking all at once. What else could be expected than they should find against Hillstrom?  *  *  *  I say without the slightest hesitation that the trial which resulted in Hillstrom's conviction was the most unjust, wicked, and farcical travesty on justice that has ever occurred in the West. To an impartial board of pardons I can easily demonstrate such fact without any argument.  *  *  *  'And so,' continued the judge (respondent) impressively, 'Joseph Hillstrom will die, as I am wholly satisfied it has long ago been determined,  *  *  *  'but,' continued the judge, reflectively, 'I prophesy he will die a game man, true to the last breath of his life to the grand principles of free speech and free thought as exemplified by a fair trial in the courts which has been denied him. Utah evidently believes she can afford to assassinate a foreign subject under these conditions. Its a sad mistake, and in my humble opinion such day's work will breed proscriptions. It will give Utah the same name and fame as the Mountain Meadow Massacre.'"

He further, at some length, severely denounced the officers required to carry out the mandate of the court and the law as "miscreants," "murderers," and "assassins." All this from one who, as chief counsel for Hillstrom, though given unlimited time and afforded every opportunity before the board to point out wherein he claimed the evidence was insufficient to justify the verdict, and to bring forth any new matter, or anything which he might deem beneficial to his cause, yet made no attempt to point out or to present anything, and had nothing whatever in behalf of his client, except letters and telegrams from misguided and misdirected partisans, threatening the lives of members of the board and the destruction of property within the state unless their demands were complied with.

Then the respondent, claiming that Hillstrom was an alien and a subject of Sweden, sought and consulted the minister of Sweden at Washington, and solicited his efforts in behalf of Hillstrom. At the request of the minister the Governor granted a respite until the next regular meeting of the board, to enable the minister to familiarize himself with the case. At that meeting the case was again thrown at large for further hearing. The respondent even failed to appear. His associate counsel appeared, and stated that there was nothing further to be offered. Nothing further was offered. Commutation of sentence was thereupon again denied.

The respondent then in the press challenged the members of the board, including the Justices of the Supreme Court, to a public debate—"to discuss the facts at any time in any city in the United States * * * to refute the false, wicked, and cowardly aspersions on his (Hillstrom's) character. * * * This matter is now of national, if not international, importance. * * * I am only anxious and determined that if Hillstrom is judicially murdered, the people of this country, the great jury to whom we must all go at last, shall fully understand just where rests the full measure of responsibility for the deep damnation of his taking off."

Thirty days after the second application for commutation was denied Hillstrom was executed. In accordance with his request, his body was turned over to members of the Indus-

trial Workers of the World and taken to Chicago for burial, where, attended by a large concourse of members and sympathizers of that organization, he was buried with somewhat flaunting obsequies, at which the respondent was the chief funeral orator. His address was stenographically reported, and when transcribed was "O. K.'d" by him. The transcript of it consists of more than thirty pages of typewriting. It was made a part of the information and put in evidence. Space permits reference to only parts of it. He told his hearers that, in joining his tribute with theirs "for this dead man," and, looking into their faces, he "read a determination, and a grim one too, to know about this matter and what the facts and circumstances are attendant thereon"; that he was "thoroughly conversant with the case, and I want to tell it, all of it, to you today. * * * The genesis of this transaction and of this tragedy out in Salt Lake City took its rise in the bureaucratic power of the Mormon Church, * * * a bureaucracy dominated by greed, selfishness, and a plentitude of power that has defied the government of the United States, and today teaches its followers that supreme power resides in the church, and that it will visit with vengeance upon any questioning of that power. Don't let anybody, my friends, fool you into the belief with the lying story that this power is diminishing. It was never so powerful as it is today, never before so dangerous." He then, to further prejudice and inflame his hearers, declared that the Mormons were driven from Illinois because of their peculiar tenets and practices, in bitter terms maligned and abused them, charged them with unheard-of and countless persecutions, and with exaggerations and untruthful additions dramatically related to his hearers the Mountain Meadow Massacre; told them that, "The Mormons, with this same spirit of intolerance, jealousy, and vindictiveness * * * looked with suspicion upon the coming of the Gentiles, like you and me and Joe Hill—they call them Gentiles— * * * and said to themselves, 'We will get them out of here, if not one way, then another,' " and without cause insolently referred to the Mormon Church as the "vilest thing in our national life today," and as that "hideous, slimy monster which made this crime (Hill-

strom's conviction and execution) here possible." Continuing, the respondent further said:

"Now, into these surroundings not long ago came a young man, a Swedish boy, by name Joseph Hillstrom, generally known as Joe Hill. * * * Himself a working man, * * * dwelt in the depths where men labor, *. * * sympathizing with them and being one of them, and looking forward to that bright dawn, as he hoped, of an industrial freedom and liberty; * * * a Mormon jury to convict him and a Mormon Governor to deny him the poor boon of a commutation. Do you believe, men and women of Chicago, that this silent form would be in your midst today if Joe Hillstrom had been a good Mormon, paying his tithes promptly to the church, and had had two, three, or four wives to call him husband? * * * And when that jury was sworn Joe Hill's fate was sealed. That is all there was to it. And when the villainy of the conviction became known and its awful import swept over the land, more than a hundred thousand petitioners, grand men and women from every state, wrote and wired the board of pardons."

Then the respondent assumed to relate the facts of the case and the evidence adduced against Hillstrom on the trial. His recitals were but garbled parts of the record. The principal facts and evidence identifying Hillstrom and showing him to have been one of the perpetrators of the crime were purposely withheld. Referring to but garbled portions of testimony, he exclaimed: "How is that for proof against a man on trial for his life?" Having referred to the doctrine of presumption of innocence and the rule of circumstantial evidence he further stated:

"Realizing that that was the law and that it had been promulgated in every court all over this land, we went to the Supreme Court full of confidence that the law of Utah meant what the Legislature said it should mean, and that the Supreme Court would follow the law of the state. * * * And from what the judges intimated during the arguments made in the Supreme Court, and their comments upon the evidence as we went along, there seemed to be no doubt but that the case would be reversed and a new trial granted. *

In Re Hilton, 48 Utah 172.

*   *   But with that sixth sense which we cannot name, but which we know exists, the common people, the working people, the people upon whom the crushing hand of the law bears with such force and power, they knew that something was wrong. They sensed danger. They felt that compared with the sacredness of human life that that evidence was paltry and trifling. They did not need to be lawyers to know it was insufficient. The instinct of self-preservation was gone; here was a fellowman in danger. Could such evidence go unrebuked by a court and a man be condemned to death by it? Why, it seemed incredible. If this could take place in the District Court, why might it not take place in the Supreme Court? And they began, in the only way that men have, to beseech of the Supreme Court, and to protest against the judicial wrong that was about to be done against Joe Hill. And so they began. The judges, too, set themselves against the ᵉpeople.   *   *   *   Hillstrom knew that something was wrong.`   *   *   *   He saw that the presumption of innocence was an empty form; that the state's attorney, instead of seeking the proof, only was seeking one thing, and that was a conviction.   *   *   *   Now the Supreme Court is aroused. Why, these common people—they are common after election— were really asking what the Supreme Court was going to do about the Joe Hill case, and then Joe Hillstrom ceased to be an impersonality in the eyes of the law, and the presumption of the people must seek a rebuke, and it did. When a case does not arouse personal interest in the court the justices meet, and one man is selected of the judges who writes the opinion, the rest concur, none of them feeling any personal interest in the matter. But when a case of importance arises, and there is a personal interest, each one seeks to voice his own opinion, with more affirmance than logic in this case.   *   *   *   The only question that they had any hesitancy on was Hillstrom's refusal to tell where he got that wound. That is what done the business for him. Not that he was to be proven guilty, but he must prove his innocence and tell where he got that bullet wound. The strict rule of law is there is no presumption against a defendant because he does not testify.   *   *   *   The law says that no inferences shall

In matter of charges against Orrin N. Hilton.

be deduced. But listen to, what the Chief Justice says! * * * He says that they shall be deduced. * * * This is followed by the concurring opinion of Justice Mc-Carty, * * * and by the third Justice, Mr. Frick, still harping upon the silence of Joe Hill, the boy who would not tell where he was wounded. * * * Now, my friends, would you want to be condemned in a capital case upon inferences and fancied resemblances of this sort? Even you can now see the particulars wherein the trial was unfair, and that some influence, some preponderating influence, was brought to bear upon that Supreme Court to persuade it to take an attitude of hostility toward Hillstrom. I do not say that this was done by direct influence other than the imponderable and undefined, but always present and always dominating, fear of the Mormon Church, and that the views expressed by the Supreme Court·are in consonance with the views of the church. Well, the judgment was affirmed, and he was ordered executed. There was one hope left, and that was to go before the board of pardons. * * * We went before the board of pardons with Joe's case, and what do you suppose we found? The same men, as a board of pardons, that had sat upon his case as Supreme Judges, with the addition of the Governor. * * * I said to the judges, 'You are no longer Justice Straup, nor Justice McCarty, nor Justice Frick. You are Citizen Straup, Citizen McCarty, and Citizen Frick. And now, Citizen Straup, I want to discuss with you the opinion of Chief Justice Straup, when he delivered this opinion. * * *' That was pretty plain, wasn't it? * * * Well, he was furious in a minute, and in less than five minutes from that time I had them all on their feet, and I said: 'Why, I cannot talk to you three men at once. I will take you one at a time.' And so from two until six o'clock I insisted that the law was thus and so, and they. said, 'Why, it is only your opinion, sir.' I said, 'That may be, but my opinion is infinitely better than yours because the law is behind me and it is not with you.' Well, the hearing was concluded at six o'clock. There wasn't a chance in the world. They were bound to consider only that preconceived opinion as judges. Finally the Governor said: 'Say, Hilton, can't you make that fellow talk over there?' 'Well,' I said, 'What

do you want him to say?' 'Well, I want him to give an explanation of where he received that wound.' See? Still trying to make him prove himself innocent. I said: 'He don't have to do it. That isn't the law. The people should prove him guilty, and I stand by that principle of law. I don't care. Joe can talk if he wants to, but I am not going to ask him to, because he is right and you are wrong, and you know it. And I say to you here and now, there is not a text book that was ever written but what contains that elemental doctrine, and you know it as lawyers, and you are not honest with yourselves or with him.' * * * We stated to them before the board of pardons if this man was judicially murdered, there would be international complications arise because he was not a naturalized subject. * * * And so I went to Washington .and interviewed the Swedish minister. * * * I had an open letter sent to all of them (the board of pardons) and printed in the Salt Lake papers (the letter challenging them to a public debate, which letter he read to his hearers). Do you suppose I ever heard from that? Oh, no. I could not smoke them out. And from that time till this they have been as silent as the grave. * * * When Hillstrom was executed I say to you men and women that justice and liberty shrieked at the awfulness of this tragedy. * * * Today these Industrial Workers of the World are down in the depths of these mines out there with their lives in their hands every moment, or before the fume-belching furnaces in the smelters, protected only by handkerchiefs. The men must breathe those poisonous gases until they can piece out the hours of their lives, and so earn the pittance that is paid them a day. * * * While they have some very wise and just laws on their statute books (in Utah), when you test them by the real everyday application, it is guided and governed entirely by what Mormon leaders may decree as to the expediency of the moment. * * * Hillstrom's protest always was against those who seek and misapply the privileges that should be distributed with even-handed justice to the rich and the poor alike, * * * and he knew that power and greed were using these practices to oppress and grind down scores of his fellow men. * * * And to you, sol-

dier, poet, martyr, and hero, with the flush of this magnificent oncoming industrial freedom upon your brow, all hail and all hail!''

All these statements by the respondent, and many more of like character, were unqualifiedly admitted. We are concerned only with those which bear and reflect upon the courts of this State, the members thereof as such, their judicial action and official conduct, and the administration of justice and of the law of this State. Neither truth, justification, excuse, nor mitigation was pleaded or relied on. The grievance committee put in evidence a complete transcript of all the evidence and proceedings had in the Hillstrom Case, the opinion of the Supreme Court and a copy of the record proceedings before the board of pardons. The respondent was in Salt Lake City, but departed therefrom on the night before the day of this hearing. He was represented by counsel, who, in argument, in a way suggested hypothetical excuses for him; but nothing by way of testimony or evidence in any particular was offered by them. The pleaded defense by the respondent proceeds on the theory that his constitutional right of free thought and free speech gave him license and guaranteed him privileges to publicly denounce and ridicule the courts of this State in such disrespectful and contemptuous terms and unbecoming language as admittedly was employed by him, and still retain good standing as a lawyer before them and the public.

Under the laws of this state (Comp. Laws 1907, Sec. **1-7** 113) it, among other things, is provided that:

''It is the duty of an attorney and counselor: (1) To support the Constitution and the laws of the United States and of this state; (2) to maintain the respect due the courts of justice and judicial officers; * * * (4) to employ, for the purpose of maintaining the causes confided to him, such means only as are consistent with truth, and never to seek to mislead the judges by any artifice or false statement of fact or law.''

Among other things, an attorney may be disbarred (Section 120) for ''any violation of the oath taken by him or of his duties as such attorney and counselor'' and for moral turpi-

tude and unprofessional conduct. *In re Platz*, 42 Utah 439, 132 Pac. 390; *State ex rel. Mackintosh* v. *Rossman*, 53 Wash. 1, 101 Pac. 357, 21 L. R. A. (N. S.) 821, 17 Ann. Cas. 625. And then courts having power to admit attorneys to the bar also possess as a necessary and inherent incident to such power the right to disbar them for unworthy behavior, unprofessional conduct, or moral turpitude, or moral unfitness, independent of their authority by statute. *Morrison* v. *Snow*, 26 Utah 247, 72 Pac. 924; *In re Platz, supra; In re Thatcher*, 80 Ohio St. 492, 89 N. E. 39. Where a statute makes good moral character, as does ours, a condition precedent to admission to the bar, it follows that when an attorney has forfeited his claim to such character by misconduct of such a nature as to render him unworthy and unfit to further be continued in office, the court may remove him. *Sanborn* v. *Kimball*, 64 Me. 140; *State* v. *McClaugherty*, 33 W. Va. 250, 10 S. E. 407; *In re Boone* (C. C.), 83 Fed. 944; *Bradley* v. *Fisher*, 13 Wall. 335, 20 L. Ed. 646; 2 A. & E. L. (2d Ed.) 303. The respondent had the undoubted right, privately or publicly, to criticize the decision of this court, to point out what he claimed to be defects or faults therein, express opinions respecting it, and his disapproval of it, to censure it within the limits of decency, and to set up his judgment against that of this court, or of any court. He, indeed, was privileged to assert what his conduct implies, that the decision of this court in the Hillstrom Case should not be final, and ought to be subject to review by a mass convention of Industrial Workers of the World, presided over by himself. Comprehensive as respondent's rights and privileges in such respect may be, yet, as stated by Justice Story (Story, Const., vol. 2, Sec. 1880 (4th Ed.)):

"Every man shall have a right to speak, write, and print his opinions upon any subject whatsoever, without any prior restraint, so always that he does not injure any other person in his rights, person, property or reputation, and so always that he does not thereby disturb the public peace or attempt to subvert the government."

And, as has been repeatedly held, liberty and freedom of speech under the Constitution do not mean the unrestrained right to do and say what one pleases at all times and under all circumstances (*Warren* v. *U. S.*, 183 Fed. 721, 106 C. C. A.

156, 33 L. R. A. (N. S.) 800), and do not license scandal and defamation of courts (*McDougal* v. *Sheridan,* 23 Idaho 191, 128 Pac. 954; *Burdett* v. *Commonwealth,* 103 Va. 838, 48 S. E. 878, 68 L. R. A. 251, 106 Am. St. Rep. 916) ; that it is the use and not the abuse of free speech that is protected, and that every one at all times is responsible for an abuse of the privilege (*Diener* v. *Star-Chroncile Pub. Co.,* 230 Mo. 613, 132 S. W. 1143, 33 L. R. A. (N. S.) 216) ; and that an attorney, guilty of such abuse by slandering or scandalizing or defaming a court or judge, is subject to discipline and disbarment (*Cobb* v. *U. S.,* 172 Fed. 641, 96 C. C. A. 477; *In re Thatcher,* 80 Ohio St. 492, 89 N. E. 39 ; s. c., 83 Ohio St. 246, 93 N. E. 895, Ann. Cas. 1912A, 810 ; *In re Breen,* 30 Nev. 164, 93 Pac. 997 ; *People* v. *Green,* 7 Colo. 237, 3 Pac. 65, 49 Am. Rep. 351). The proposition, supported by cases there cited, is thus put in 2 R. C. L. 1093 :

"Where an attorney indulges in invective or in scandalous innuendo that tends to degrade the court or to impair its respectability and usefulness, it is the duty of the court to take such steps as may appear to be necessary to preserve its dignity and good name, even to the expulsion of the offender from practicing before it."

And, as there further stated, to confer jurisdiction to disbar therefor it is not necessary that the indignity or insult should occur in open court, or constitute a statutory contempt, or be concerning a matter still pending before the court, and that such an offender may be dealt with (page 1098) for acts and misconduct committed in another state.  Speaking of the obligation of attorneys, Mr. Justice Field, in *Bradley* v. *Fisher,* 13 Wall. 335, 20 L. Ed. 646, well.says :

"The obligation which attorneys impliedly assume, if they do not by express declaration take upon themselves, when they are admitted to the bar is not merely to be obedient to the Constitution and laws, but to maintain at all times the respect due to courts of justice and judicial officers. This obligation is not discharged by merely observing the rules of courteous demeanor in open court, but it includes abstaining out of court from all insulting language and offensive conduct toward the judges personally for their judicial acts."

And, as has been seen, such obligation is expressly imposed by the statute.

Whether the respondent on the occasion in question did or did not state all of the facts in the Hillstrom Case is not in itself important. It was but natural on such an occasion, if thought fit and proper to refer to them at all, to refer only to those most favorable to the dead, and to minimize those against him. Had respondent's purpose been but to speak devoutly of him, it would have been of little consequence whether any or all, or only a part, of the facts had been referred to. But manifestly that was not his purpose; at least not his only nor chief purpose. He sought the solemn occasion to express his contempt for, and to show his disrespect to, the courts of this state, to disparage their judicial conduct and action, to scandalize and degrade them, to impair their usefulness, and to bring the administration of justice and the law of this state into disrepute. With such object and for such purpose he, after asserting that he would tell his hearers all the facts and circumstances of the case, gave them but garbled portions of them, misrepresented the proceedings had before the courts and the board, and withheld the most essential facts connecting Hillstrom with the commission of the offense, and villified and abused the Mormon Church as premises for falsely charging it with influencing and interfering with judicial action, and for characterizing the courts of the state as but fearing slaves to its preponderating power and imponderable influence. Respondent's counsel on this hearing in open court unqualifiedly admitted that the Mormon Church had nothing whatever to do with the Hillstrom Case; that the slain storekeeper and his son were non-Mormons; that the district attorney who prosecuted the case, the district judge who tried it, the Attorney General who represented the state before the Supreme Court, and all three members of the Supreme Court were all non-Mormons; that no Mormon had been a member of the Supreme Court since statehood, a period of more than twenty years, and that only two of them, a short time, about a year, had been members of the Territorial Supreme Court covering a period of more than forty years; that the jury who convicted Hillstrom was made up of Mormons and non-Mor-

mons alike, one of respondent's counsel, and who also was one of Hillstrom's counsel, stating at this hearing that to his knowledge "only one of them, the foreman, was known to be a Mormon."

. That a most revolting double murder was committed was conceded by every one connected with the Hillstrom Case. The state produced good and sufficient evidence, not only circumstantial in character, but credible and unimpeached testimony of eyewitnesses, to connect Hillstrom with it. Against that evidence he produced nothing, not even any evidence as to his whereabouts or of his movements on the night of the homicide. The trial of the case and the review of its proceedings were in no respect other than or different from a trial or a review of a similar case elsewhere. Our Constitution and statutes throw around one accused of crime all the safeguards found in other jurisdictions. Hillstrom was protected in all these, and was granted every right and privilege vouchsafed by the law anywhere. It was wholly immaterial whether the victims or the perpetrators were Mormons or non-Mormons, or members of any church or of any organization. Familiar with the proceedings as he was, the respondent well knew that no such questions, in any degree, entered into the consideration of the case, either in the court below, in this court, or before the board. All such matters, and of church influence, were disclaimed at this hearing. Respondent's tirade against the Mormon Church and its people were but premises for his further false charges that Hillstrom would not have been convicted had he been a Mormon, and that "when the jury was sworn, Joe Hill's fate was sealed;" that the law of Utah "is guided and governed entirely by what Mormon leaders may decree as to the expediency of the moment;" that this court under, "a preponderating and an imponderable and ever-present influence of the Mormon Church, assumed an attitude of hostility towards Hillstrom," and in its opinion and in the rendition of its judgment but "expressed views in consonance with the views of the church." Nothing by way of evidence or argument, or otherwise, was shown or offered to substantiate or justify any of these statements, or that the courts of this state, in any degree, are domi-

In Re Hilton, 48 Utah 172.

nated or influenced by the Mormon Church, or that it or its leaders or people in any respect interfere or attempt to interfere with, or influence or attempt to influence, judicial action whatsoever. Nor was there anything offered in excuse of or in mitigation of such false statements; not even a regret or an apology for the making of them; nothing, except his counsels' repudiation and disapproval of them. Any court or judge subject to any such charged influences is unworthy to sit in any cause. A member of the bar, falsely making such charges and offering nothing in defense, justification, or excuse, except his claimed constitutional right to so scandalize and degrade the court of whose bar he is a member, is not longer worthy such membership.

The respondent also, in other respects, referred to this court in most disrespectful language, misrepresented its opinion and the proceedings before the court and the board. He said:

"From what the judges intimated during the arguments * * * there seemed to be no doubt but that the case would be reversed and a new trial granted."

There was nothing whatever to justify that. As is usual in arguments before the court, questions were asked by members of the court, but neither made comments on the evidence nor said anything to indicate his view or impression of the case, nor as to the merits or demerits of any point presented or argued. And then:

"But with that sixth sense which we cannot name, but which we know exists, the common people, the working people, * * * knew that something was wrong; they sensed danger * * * and began to beseech the Supreme Court and to protest against the judicial wrong that was about to be done Joe Hill. The judges, too, set themselves against the people. * * * Now the Supreme Court is aroused. Why, these common people were really asking what the Supreme Court was going to do about the Joe Hill case."

Such flamboyant appeals to the prejudices of his hearers were utterly inexcusable, violative of his duty and obligation to maintain proper respect due courts and judicial officers, and are more befitting the mountebank than a worthy member of the bar. Still speaking of the court, he said:

"The only question they had any hesitancy on was Hillstrom's refusal to tell where he got that wound; that is what did the business for him. Not that he was to be proven guilty, but he must prove his innocence and tell where he got that bullet wound"

—and then declared that we, in violation of the statute, held that Hillstrom's failure to take the stand and testify was an inference of guilt. It is almost inconceivable how any unprejudiced and fair-minded lawyer, reading the opinion and desiring to conscientiously reflect it, can then say, The only hesitancy we had "was Hillstrom's refusal to tell where he got that wound; that is what did the business for him." A mere reading of it shows such statement to be unfair and unjustifiable. There was ample evidence without Hillstrom's wound to connect him with the commission of the offense. His unexplained fresh gunshot wound, in connection with the proof that one of the assailants answering Hillstrom's description was shot in the store at the time of the homicide, was a relevant fact and mark of identity. Its weight, as we said in our decision, was entirely for the jury. Its relevancy ought not to be disputed by any good lawyer. It was not disputed, either in the court below or in this court. Respondent, of course, without offending, was privileged to thereafter dispute it, as well as every other proposition decided or determined by us. But he, to give color to his false charge that the Mormon Church dominated the courts of this state, who, in servile obedience to its influence, "judicially murdered" Hillstrom, and to bring them into disrepute and to be despised, falsely represented that the only substantial evidence upon which Hillstrom was convicted was that he, "six miles away, a few hours after the homicide, applied at a doctor's office for the treatment of a wound," and that his failure to take the stand and explain where and how he had received it "did the business for him."

Equally unwarranted is the assertion that we held Hillstrom's failure to take the stand and testify was an inference of guilt. At this hearing respondent's counsel were asked to point to language in the opinion justifying such assertion. This is pointed to:

"Nor can his neglect or refusal to be a witness in any man-ner prejudice him or be used against him. The state, as in all other criminal cases, was required to prove the defendant's guilt beyond a reasonable doubt. But the defendant, with-out some proof tending to rebut them, may not avoid the nat-ural and reasonable inferences deducible from proven facts by merely declining to stay off the stand or remaining silent. If in case of larceny the theft and the unexplained or unsatis-factorily explained recent possession of the stolen property in the accused are shown, he may not avoid the natural infer-ence deducible from such facts that he is the thief by remain-ing silent or staying off the stand, and offering no proof to rebut such inference. Here the commission of the offense is proved beyond all doubt. That is conceded. Other facts also are shown from which natural and reasonable inferences arise that the defendant was one of, and the active, perpetrator of the offense. The probative effect of them and the natural and reasonable inferences deducible from them cannot be avoided by the defendant remaining silent or refusing to take the stand and offering no proof to rebut them. While the proven facts and inferences against him are neither strengthened nor weakened by his mere silence or failure to take the stand, yet when he, with peculiar knowledge of facts, remains silent, or has evidence in his power by which he may repel or rebut such proven facts and inferences, and chooses not to avail himself of it, he must suffer the consequences of whatever the facts and inferences adduced against him tend fairly and reasonably to prove."

But they do not say such language implies what the re-spondent stated it did, an inference of guilt from Hillstrom's failure to be a witness, but now say that we, by such language announced something violative of the familiar doctrine that one presumption or inference cannot be based upon another. That statement is as unwarranted as is the respondent's state-ment. Counsel say: "An inference cannot be based upon an inference." What is there in the quoted language which im-. plies that it may? The contrary is implied. They say:

"But an inference must be based upon a solid premise or proven facts about which there is no question. The premise

must be an attested fact, and in order for the statement of the Chief Justice, as well as the Associate Justices, to be good law, Hillstrom's identification must be complete in order that an inference could properly flow, under the law. When the learned Chief Justice says that a defendant cannot object to the inferences that naturally flow from proven and uncontroverted facts, indeed, he has misinterpreted the meaning of those terms.''

What the ''learned Chief Justice'' said is best shown by his own language. What he said is:

"The defendant, without some proof tending to rebut them, may not avoid the natural and reasonable inferences deducible from proven facts," etc.

When a fact is proved, a thing established or ascertained, as truth, reality (32 Cyc. 739, Black's Law Dict.), it would seem to rest on a pretty solid basis. The respondent and his counsel seem to have the notion that ''an inference could properly flow'' only when ''Hillstrom's identification'' as the perpetrator of the crime was established ''by attested facts,'' by direct and positive evidence. When so established what is the sense of talking about an inference? Is it possible that counsel, and the respondent, ''a lawyer of national repute as a defending attorney, for nearly forty years engaged chiefly in the defense of those charged with crime, the author of a Revised Edition of Wharton's Law of Criminal Evidence and of a leading article upon Due Process of Law'' (respondent's brief), has not yet learned that the identity of one charged with crime may be established by natural and reasonable inferences deducible from other proven facts, and that in many instances proof of identity has rested wholly on circumstantial evidence? The work revised by him ought to have taught him better than that. He, without offending, was privileged to take issue with us as to this, to place his own construction upon our language, to dispute what we may regard is the clear and indubitable effect of it, and to question the soundness of any thing decided by us. He is not to be condemned for that, though his criticism be groundless. His unwarranted statements of our disregard of the presumption of innocence

and of the statute, standing alone, have little if any relevancy to the question in hand. They are rendered offensive and harmful because of the disrespectful manner in which they were made in connection with other flagrant and scandalous matter, and especially because made, as manifestly they were, with the evil design and intent thereby to degrade the court, impeach its integrity, discredit its knowledge of the law, impair its usefulness, and to ridicule it before his hearers.

Still speaking of the members of this court, and of the proceedings before the board, the respondent said:

The "Chief Justice was furious in a minute, and in less than five minutes from that time I had them all on their feet, and I said: 'Why I can't talk to you three men at once. I will take you one at a time. * * * My opinion is infinitely better than yours because the law is behind me and it is not with you * * * and you are not honest with yourselves or with him (Hillstrom).' "

Brave man, indeed, was the respondent as he vauntingly stood before a large concourse of Industrial Workers of the World (whom, in his brief, he now calls "a dangerous bunch of worthless whelps") and dramatically related to them how he dared to fling into the very teeth of the "furious Chief Justice" and his associates that his opinion was infinitely better than theirs, that they "were not honest" with themselves nor with Hillstrom, and how, when all three flew at him "in raucous disputation and dissent," he offered to take "one at a time." Poor Falstaff! Who pierced his doublet and his hose, hacked his sword upon a rock, then, rushing to the tavern there related how he, single-handed, fought and slew three and fifty on his back and eleven in buckram half a sword afront. For "this open and apparent shame" respondent has nothing to offer but his alleged and misconceived constitutional right of unbridled and scandalous speech. There is no foundation whatever for his assertion that any of the members of the court, or of the board, "grew furious" or otherwise demeaned himself improperly, or possessed or exhibited any hostility or prejudgment. Nor did respondent say to them that he "could not talk to all three at once," or that he "would take one at a time," or that they were not "hon-

est with themselves or with" Hillstrom, or that they were wrong and he right, or that respondent's "opinion is infinitely better than" theirs, or that the Governor said, "Hilton, can't you make that fellow (Hillstrom) talk over there?" As appears by the board's record this, in such respect, took place:

"Counsel also before the board, in criticism of the Supreme Court, contended that it, in its opinion, had held that the failure of the applicant to be a witness on the trial of the case before the district court was a circumstance to be considered against him and as an inference of guilt. Notwithstanding counsel were told that they had misconceived the opinion and did not properly reflect it, they, nevertheless, impatiently persisted in their misconception and misconstruction of the opinion, and argued as though this board was clothed with power to review and correct what counsel chose to assert were errors of law of the Supreme Court."

And, as also appears by the board's record, when respondent was asked if he desired to ask Hillstrom any question, he replied, not what he told his hearers in Chicago, but that he "had requested him to make a statement and to tell the board whatever he claimed to be the truth of the case, but that he had declined to give any information, or to make any statement, or to answer any question, except on a new trial of the case before a jury, which he had advised him this board was powerless to grant." In that, respondent before the board spoke like a lawyer; but in his Chicago speech, to inflame the prejudices of his hearers, and to degrade this court, how like a charlatan!

Now what is to be said of a lawyer, with his alleged national repute, forty years' experience, and an author, who, given as he was unlimited time and afforded every opportunity to present before the board all that he wished, and had yet presented nothing, offered nothing, not even pointing out wherein he claimed the evidence was insufficient to justify the verdict, or wherein, on the evidence, commutation of sentence or clemency was justified; asserting that the case rested wholly on circumstantial evidence, and avoiding all reference to testimony identifying Hillstrom as one of the perpetrators of the crime; flying to the newspapers with asser-

tions "that the case was prejudged," the members of this court "tenacious of their opinions and insistent in their defense of such preconceived judgment," engaging him in "raucous disputation and dissent," and that the conviction "was the most unjust, wicked, and farcical travesty on justice in the West;" challenging the Justices of this court to a public debate; misrepresenting the facts of the case and the opinion of this court; exalting Hillstrom, who was convicted of a most revolting murder by an impartial and unprejudiced jury on good and sufficient evidence against which nothing whatever was adduced to dispute it, as a soldier, hero, and martyr dying in the cause of freedom and liberty, and parading his body before the Industrial Workers of the World as one put to death and judicially murdered by the Mormon Church and the courts of this state; characterizing the officers executing the mandate of the law and of the court as "miscreants," "murderers," and "assassins," and frenziedly exclaiming that when Hillstrom was executed "justice and liberty shrieked at the awfulness" of the tragedy? Such conduct and misbehavior, hereinbefore referred to, are unworthy a member of the bar, unprofessional and disrespectful to courts and judicial officers, impair their usefulness, bring the administration of the law into disrepute, and constitute a willful violation of his obligation and oath as an attorney and counselor.

When called upon to answer therefor he but attempts to shield himself behind his alleged constitutional right to thus demean himself and with immunity thus to assail the courts and judicial officers. And in his brief filed since the submission of this cause now asserts, what was disclaimed at the hearing, that since the Mormon percentage of the population of this state is from fifty to sixty per cent. "it would be a ridiculous statement to deny that an imponderable influence is exercised upon many of the officers of the State of Utah," and that "imponderable influence is unsusceptible of proof;" that he desires to assume the natural meaning of words spoken and written by him and to shirk no responsibility therefor; that he had "a perfect right to challenge the board of pardons," in the manner as was done by him, and that he, in his

open letter, stated "exactly what he meant to convey, and were it to be stated again, should the occasion arise, would not change a word;" ironically congratulates the committee, putting in evidence the decision of this court in the Hillstrom Case, "on making a citation without comment;" advises establishing at Salt Lake City "a night school for lawyers," to which the committee "be admitted to the kindergarten," and offers to contribute towards its support; rebukes it for instituting this proceeding which he asserts "has no parallel in American jurisprudence for audacity and un-Americanism," and says "there is more authority to justify the disbarment of every member of the grievance committee for bringing this action" than for the disbarment of himself; morbidly insinuates that the same predominating and imponderable church influence over the committee brought about these proceedings as influenced this court in the Hillstrom Case, and suggests that the court, by denying the prayer of the committee, "now has a most excellent opportunity to declare their independence of un-American and un-Democratic influences" and to say "to the despicable and cowardly influences that have fostered this cause" that "we will not be your champions for the furtherance of your insidious designs by striking down one who has dared to attack you." Such manifest effrontery added insult to injury, disrespect and indecency to both the court and bar, but accentuate respondent's shown delinquency, and render our duty plain in the premises. His insinuations that the Mormon Church had anything whatever to do with instituting these proceedings, or in influencing the committee, are as groundless and as wantonly false as are his assertions that Hillstrom's conviction and execution were due to such influences.

We think the law as announced by the authorities heretofore referred to when applied to the facts in hand well justify respondent's disbarment. The maintenance of proper respect due the courts and judicial officers of the state requires it. This, not to punish for any slander or defamation of their character, or for any wrong or injury done them as individuals, for their individuality is lost in the majesty of the office, but to preserve and uphold the dignity, respecta-

bility, and good name of the courts themselves and to protect them and the public from one shown to be unworthy and unfit to be a member of the honorable profession.

It therefore is ordered and adjudged that the respondent be, and he hereby is, disbarred from practicing as an attorney and counselor at law in any of the courts of this state, that his name be stricken from the roll, and that he pay the costs of these proceedings. Let the order so be entered.

McCARTY, J., concurs.

FRICK, J.

I concur. I, however, desire to add a few words to what the CHIEF JUSTICE has said. If the respondent upon one occasion only, or under the sting of defeat, had criticized this court, no doubt the grievance committee, as well as we, would have disregarded the criticism, although it might have been wholly unjustified. When, however, as is the case here, the defeated attorney goes out of his way to have the public press publish his statements, which he calls interviews, and when he, in public addresses and otherwise, falsely and maliciously assails the members of this court for the sole purpose of arousing the passions and engendering the prejudices of a certain class against the court, the case is quite different. No self-respecting bar committee nor court can, under such circumstances, overlook the transgressions without lowering the standard, if not entirely destroying the respect for both bench and bar. That the respondent willfully and maliciously sought to destroy the respect due this court was manifested by him in many ways. He asserted over and over again that this court, in its opinion in *State* v. *Hillstrom,* had sustained the latter's conviction by misapplying well recognized principles of law against him. These assertions were, however, made in the very teeth of the fact that neither respondent nor his associate counsel made any effort whatever to have the alleged error corrected and its effect destroyed, although a copy of the opinion was served upon them as soon as it was handed down, and that under the rules of this court they had twenty days, and as much longer as they, upon their ap-

plication to this court, may have been granted, to apprise the court of its error in that regard. The very purpose of the rule providing for petitions for rehearing is to leave the case open for the correction of errors. Every lawyer knows, and it must be assumed that respondent knew, that the court had committed no error in the respect urged by counsel, and hence none could have been corrected. The alleged error was therefore used as a pretext to villify this court and the members thereof. As pointed out by the CHIEF JUSTICE, lawyers, whether acting as attorneys in a case or not, as well as others, may freely criticize the court's reasoning as well as its judgments and conclusions, if done in decent language. But an attorney may not, as respondent has done, falsely and maliciously assail the court merely because he may not have been successful in having his views of the law adopted by the court. To permit attorneys to pursue such a course would inevitably result in destroying the respect for all courts, and when once the respect for the courts is gone they cannot much longer survive. Moreover, there was not the slightest excuse for respondent's conduct, either in law or in fact.

True, it was urged at the hearing by his counsel that the respondent's sympathy for those accused of crime may have betrayed him into what may seem harsh conduct. It was said his great reverence for the principle that all men are presumed innocent until their guilt is established beyond a reasonable doubt may have misled him into making some of the statements made by him. Let that be granted, and still there is nothing to palliate respondent's conduct, much less excuse it. If respondent's sympathies are so strong for human frailties, he should not lavish all of them upon those alone accused of crime. He should have some little regard for those whose duty it is to deal with that class. All are entitled to fair treatment, and a lawyer who, without cause or provocation, will conduct himself as the respondent has done is no longer worthy of that high trust and confidence which all courts must necessarily repose in attorneys as officers of the court. Respondent's name should therefore be stricken from the roll as unworthy of the honor which by retaining it thereon would be implied.