STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,

v.

Kirksey M. NIX, Respondent.

No. 1517.

Supreme Court of Oklahoma.

March 20, 1956.

J. B. Dudley, Oklahoma City, Hicks Epton, Wewoka, Marvin T. Johnson, Tulsa, for complainant.

Robert J. Bell, McAlester, J. A. Rinehart, El Reno, Fred W. Whetsel, George L. Hill, McAlester, H. Tom Kight, Jr., Claremore, for respondent.

JOHNSON, Chief Justice.

This is a proceeding to review the action of the Executive Council of the Integrated Bar of Oklahoma, recommending that Kirksey M. Nix, an active member of the Oklahoma Bar, be suspended from the practice of law for a period of one year on each of three counts or charges of misconduct in violation of the Canons of Legal Ethics, the three one-year periods to run concurrently.

The proceeding herein was commenced before the Executive Council on the 2nd day of March, 1954, and the final briefs were filed in this court on January 11, 1956, and the case became at issue on the latter date.

It is necessary that we here notice the substance of the three counts or charges and the defenses thereto.

The first count charged in effect that Mr. Nix made a vigorous and unjustified attack on the integrity and sincerity of the Criminal Court of Appeals of the State of Oklahoma, and the individual judges thereof in connection with a murder case in which said court on appeal had affirmed the trial court judgment based on jury verdict of conviction and death penalty; that such attack was made by Mr. Nix in writing and was delivered to certain newspapers for publication. We need not quote, but it is apparent that the written statements of Mr. Nix contained matter and statements which were intemperate and highly improper in substance.

The defense was that the statements were privileged since Mr. Nix was at all times involved a member of the Oklahoma State Senate; that the written statements above referred to were copies of a speech or press release upon a speech, which Mr. Nix had made, or was making on the floor of the Senate which properly pertained to a matter being considered by the Senate in regular session.

The second count charges in effect that from time to time over a period of several months during which the State Senate was in regular session, with Mr. Nix as a regular member thereof, that he acted as attorney for the convicted defendant in the murder case above mentioned, and rendered professional services in behalf of said defendant in Senate Committee hearings, and wrongfully extended such hearing so as to constitute a re-trial of the murder case, or

a re-examination of the evidence therein, in an attempt to utilize political pressure to unduly influence the courts in connection with the murder case, and with the convicted and condemned defendant, while concealing from the Senate that he was an attorney for such defendant.

The defense to this count or charge was that during all that time Mr. Nix was the Chairman of a regularly constituted committee of the State Senate engaged upon an investigation fully authorized and directed to conduct hearings leading to recommendations for legislation to be considered by the State Senate; that he was never in any manner employed to act as attorney for the convicted defendant, and never did so act, but at all times properly acted in these matters only in his capacity as a State Senator. It is urged that as to those matters, Mr. Nix was answerable only to the State Senate, and that so far as concerns this case the actions and statements of Mr. Nix were privileged.

The third count or charge deals with actions and statements of Mr. Nix several months after adjournment of the State Senate. That count will be considered later in this opinion. We think we should first consider and dispose of counts one and two.

The senatorial immunity or privilege claimed by Senator Nix is based primarily on the provision of Art. 5, § 22 of the Oklahoma Constitution, O.S.1951, which provides:

"Senators and Representatives shall, except for treason, felony, or breach of the peace, be privileged from arrest during the session of the Legislature, and in going to and returning from the same, and, for any speech or debate in either House, shall not be questioned in any other place."

Similar provisions of privilege are found in all, or nearly all, other State Constitutions. See "Constitutions of the States and United States" by New York State Constitutional Convention Committee (1938).

This privilege is founded upon long experience and arises as a means of per-petuating inviolate the functioning processes of the legislative department of government. Legislators are immune from deterrents to the uninhibited discharge of their legislative duties, not for their private indulgence, but for the public good. Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 786, 95 L.Ed. 1019. In that decision by the Supreme Court of the United States, it was said:

"Freedom of speech and action in the legislature was taken as a matter of course by those who severed the Colonies from the Crown and founded our Nation. It was deemed so essential for representatives of the people that it was written into the Articles of Confederation and later into the Constitution."

The profundity of such provision is reflected in the fact that in Virginia, as well as other colonies, the assemblies had built up a strong tradition of legislative privilege before the Revolution. See Clarke, Parliamentary Privileges in the American Colonies (1943), Passim, especially 70 and 93 et seq. This was true of Virginia despite the fact that Thomas Jefferson, in his notes (written in 1781) on Virginia, said:

"The tyranny of the legislatures is the formidable dread at present, and will be for long years."

See Jefferson's Notes on State of Virginia (3rd Am. Ed. 1801); 30 Am.Hist.Rev. 511 (1925).

In this connection Woodrow Wilson, page 303 of his book, "Congressional Government," said:

"It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees. It is meant to be the eyes and the voice, and to embody the wisdom and will of its constituents. Unless Congress have and use every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served; and unless Congress both scrutinize these things and sift them by every form of

discussion, the country must remain in embarrassing, crippling ignorance of the very affairs which it is most important that it should understand and direct. The informing function of Congress should be preferred even to its legislative function. The argument is not only that discussed and interrogated administration is the only pure and efficient administration, but more than that, that the only really self-governing people is that people which discusses and interrogates its administration."

And we think this same reasoning may well be applied to a state legislature.

A look into the history of legislative privileges as prevailed in the colonies discloses a much larger and less limitation on the powers and privileges granted members of some of their lawmaking assemblies. In fact, the privileges were, in some instances, available to the servants of members, Clarke, Parliamentary Privilieges in the American Colonies, supra. The powers and privileges were limited in some colonies only by the will of the majority of the members of the assembly, Id. But by constitutional limitations such as Article 5, § 1, Const. of Oklahoma, their powers were limited to legislation, and under Article 5, § 22, Oklahoma Const., supra, members are only privileged from arrest with noted exceptions, during the session of the legislature and in going to and returning from same, and for any speech or debate in either house, they shall not be questioned in any other place. While in other states the constitutional privileges are limited to and during the session of the legislature and for a given period next before the commencement and after the termination of each session, e. g. See Art. 4, § 11, Const. of Cal. and Art. 3, § 14, Const. of S.C. These constitutional limitations were no doubt due to the historic experiences of recorded abuses of prior colonial legislative assemblies in granting themselves excessive legislative privileges and was probably one of the reasons why Jefferson expressed fears of the future tyranny of legislatures. See The Writings of Thomas Jefferson, supra.

Respondent's brief directs our attention to Hughes v. Bizzell, 189 Okl. 472, 117 P.2d 763, where this court held in paragraph 4 of the syllabus as follows:

"Statements made by the President of the State University and Dean of the Medical School, at a session of the Board of Regents of the University, as to the fitness of an employee of the Medical School, who had been discharged by the President and Dean, and who had demanded and was given a hearing before the Board as to whether the discharge should stand, where absolutely privileged, and the motives and falsity of the statements are immaterial. Such statements are not unlawful so as to make the President and Dean liable for damages for conspiracy in causing the discharge of the employee."

And also to the language quoted in that opinion as follows:

" 'The great underlying principle upon which the doctrine of privileged communications rests is public policy. This is more especially the case with absolute privilege, where the interests and the necessities of society require that the time and occasion of the publication or utterance, even though it be both false and malicious, shall protect the defamer from all liability to prosecution for the sake of the public good. * * *' "

In Coffin v. Coffin, 4 Mass. 1 there is a very wholesome statement that the constitutional provision for these privileges ought not to be construed strictly, but liberally, to support the rights of the people, by enabling their representatives in the legislative branch of government to execute all of the functions of their offices without fear of any character of prosecution for what they say or do in the execution of the duties of their offices.

The respondent places justified reliance on the case of Tenney v. Brandhove, supra, and points to this further language in that decision:

"The claim of an unworthy purpose does not destroy the privilege. Legis-

lators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to the motives. The holding of this Court in Fletcher v. Peck, 6 Cranch 87, 130, 3 L.Ed. 162 [167], that it was not consonant with our scheme of government for a court to inquire into the motives of legislators, has remained unquestioned. See cases cited in State of Arizona v. State of California, 283 U.S. 423–455, 51 S.Ct. 522, 526, 75 L.Ed. 1154 [1165]. Investigations, whether by standing or special committees, are an established part of representative government. Legislative committees have been charged with losing sight of their duty of disinterestedness. In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses. The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province. To find that a committee's investigation has exceeded the bounds of legislative power it must be obvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive. * * *"

The brief of respondent emphasizes the fact that when Senator Nix made his speech on the Senate floor and delivered press releases to newspaper men that the Senate was then in session, and that it was also in session during the period of time referred to in the second count when Senator Nix was Chairman of a duly constituted and authorized committee of the State Senate.

As to that part of the second count referring to Mr. Nix as attorney for and as representing the defendant in the murder case as his attorney, we observe in the record several instances where Mr. Nix vigorously espoused the cause of the innocence of the defendant as to the crime of murder for which he had been convicted, and that Mr. Nix took vigorous issue with the methods of the trial in which the defendant was convicted and condemned to death. Mr. Nix also questioned whether the defendant in that case had been given a fair and impartial trial. These matters by implication place Mr. Nix in the position of acting in behalf of or in the interest of the defendant in that case. However, Mr. Nix denies that there was any relationship of attorney and client existing between him and the defendant in that murder case. That is corroborated by the testimony of attorneys who actually represented that defendant as his attorneys in the trial court and in the Criminal Court of Appeals. That positive testimony must be taken as overcoming any implications that the relationship of attorney and client existed between Mr. Nix and that defendant. Mr. Nix assured his colleagues in the Senate and in the Senate Committee that he was not appearing for or representing the defendant in that murder case as his attorney. It appears that both the Committee and the State Senate were satisfied on that point. In short, Mr. Nix contends that he acted only as a Senator and not as an attorney for the convicted and condemned defendant, and since the Senate Committee and the State Senate evidently so decided, we must leave that determination to the Senate. In view of that determination this court is not authorized nor at liberty to determine otherwise, and from all the facts and circumstances we do not determine otherwise.

We also observe the statute 12 O.S.1951 § 1443 dealing with Libel and Slander which sets out the privilege applicable to publications or communications made in any legislative proceeding.

Under the expressions above stated, we find that respondent Mr. Nix is entitled

to full senatorial immunity and privilege as to the matters charged against him in counts one and two, and we therefore, disapprove and deny the recommendations of disciplinary action against Mr. Nix on those two counts.

In the third count it was charged that more than four months after adjournment of the State Legislature, Mr. Nix made a speech over or before or for television in which he discussed the same murder case and in connection therewith made similar attacks upon the Criminal Court of Appeals, the District Court of Tulsa County, and the United States Supreme Court. Again we find no need to quote, but only to observe that said speech contained matter and statements which were intemperate and improper.

■ When Mr. Nix's speech on the floor of the Senate is eliminated by reason of privilege, there remains for our consideration only what he said at his home for television. However, in justification of his action, it was his undoubted right, privately or publicly, to criticize the decision of the Criminal Court of Appeals, to point out what he claimed to be defects or faults therein, express opinions respecting it, and his disapproval of it, to censure it within the limits of decency, and to set up his judgment against that of the Criminal Court of Appeals, or of any court, but, comprehensive as respondent's rights may be, liberty and freedom of speech under the Constitution (and his oath as an attorney) do not mean the unrestrained right to do and say what one pleases at all times and under all circumstances. In re Hilton, 48 Utah 172, 158 P. 691, and cited authorities; 12 Am.Jur., Contempt, Sec. 12.

In this connection it is argued by complainants that respondent's conduct should be viewed by this court, not only in its individual aspects, but in its panoramic whole; that when so taken, the speeches and conduct of Senator Nix violated the Canons of Professional Ethics of the Bar, which subjected him to disciplinary action, even though a State Senator as well as a lawyer; that under such circumstances this court's adoption of their recommended suspension would be justifiable. But for the legislative

privileges hereinbefore discussed, we might well agree. Now, granting that the unprivileged remarks of Senator Nix were over the border line of good professional conduct, yet there are the mitigating circumstances that he was the Chairman of the Senate Committee clothed with power to make an investigation into the murder case, which was done. Also there is some showing that Mr. Nix was subjected to pressure or was over-persuaded to make this statement for television, and that it was not a plan that he originated or that he entered into of his own wholly free-willed volition, nor is it indicated that he yielded to this urged television plan for any malevolent purpose or with any evil motive or personal malice. Furthermore, the remarks here made, though improper and unprivileged, were of the same general tenor as the remarks theretofore made in the State Senate, and the respondent may have thought in good faith that these later remarks would be likewise privileged. If that be so, the conclusion was wrong, but we should consider that along with all the circumstances.

■ Upon full consideration we are convinced that the action and findings of the Executive Council of the Bar Association on this third count are sustained by the evidence and are correct, but we do not believe the recommendation for suspension for one year should be approved. As presented, that recommendation is equivalent to disbarment for one year, and we feel that would be too severe under all existing circumstances. We have reached this conclusion after full consideration of the extenuating or mitigating circumstances. In addition to the points above mentioned, we observe that all these matters have had wide publicity, and over a long period of time. The murder case, which was a noted one, the hearings in the Senate Committee, followed by these charges with numerous hearings, all were given publicity. In this manner Mr. Nix has already suffered some substantial penalty. He is a member of the bar and of the State Senate, and his misstep, if we should so characterize it, is a matter of first impression as to ethical conduct of a member of the Bar, involving

the newest medium of publicity. This is also the first case since the integration of the Bar which involves the Canons of Ethics as applied to a member of the Bar who was also a member of the Legislature. In re Integration of the State Bar of Oklahoma, 185 Okl. 505, 95 P.2d 113. It could be that such a member of the Bar would not have fully understood the legal bounds of statements which could be made without involving the professional ethics. This court should be cautious lest it be harsh in the exercise of its power and authority to discipline members of the Bar.

■ The appearances of respondent on television films made at his home in McAlester were not pursuant to any meeting or action of the Senate or the Senate Committee. The Committee was an arm of the Legislature which had adjourned months before. Hence the remarks made on the telecasts were not within the protection of Art. 5, § 22. The contention of respondent that his remarks were privileged is without merit.

Therefore the speeches made on television films are to be judged the same as if made by any other member of the Bar.

For the reasons stated, the statements here involved could not be overlooked by the Integrated Bar Association, and fully justified the painstaking investigation made by the officers of the Bar. Nor can this court approve or condone the extreme statements so made, but we think a reprimand of respondent, instead of a year's suspension, better accords with even justice in this case.

■ It is the manifest duty of the Integrated Bar of Oklahoma through its proper officers and committees to receive complaints against attorneys at law and to diligently investigate, and to prosecute if there is probable cause, not for the primary purpose of punishing an attorney at law; but for the studied purpose of promoting and preserving the integrity of the bar for the common good. The Bar in the instant case, together with the trial examiner and prosecutors, who were appointed in such capacities as arms of the court, performed their duties well and faithfully. In re Integration of State Bar, supra.

Members of the Bar and Bench should be very circumspect in their appearances on television panels, or in statements on radio, or to the press, concerning cases pending or on trial, or just completed, especially near the time of the execution of the death penalty as these statements were. When there is unusual public interest and feeling, words of ordinary import take on a meaning which makes them highly inflammatory, words of criticism become words of abuse. Innuendo and implication speak with more injury than established fact. The remarks of respondent on television, though mostly, of his comment or opinion, in places went beyond comment on the decision of the court and amounted to a reflection upon the named court, as much by reason of the circumstances above mentioned, as by what he said. The remarks under the circumstances were indiscreet, ill-advised and unbecoming, and under the facts as disclosed by the record in this case wholly unjustified, and respondent is hereby censured and reproved for the statements made on the telecast.

Many members of the Bar of Pittsburg County, including judges, testified to respondent's fair dealing with his clients, of his outstanding respect for the courts and of his dependability and general good citizenship. It is apparent that he has been a valuable and successful member of the Bar and may continue so to be. These facts weigh heavily in his behalf, and in view of all that we have said, we disapprove and deny the complainant's recommendation that the respondent be suspended from the practice of law, deeming the disposition by reprimand to better accord with justice.

WILLIAMS, V. C. J., and WELCH, CORN, DAVISON, BLACKBIRD, JACKSON and HUNT, JJ., concur.

HALLEY, J., concurs except as to punishment.