**STATE of Oklahoma, ex rel., OKLA-HOMA BAR ASSOCIATION, Complainant,**

v.

**E. Melvin PORTER, Respondent.**

**SCBD No. 3371.**

Supreme Court of Oklahoma.

Oct. 18, 1988.

As Corrected Dec. 20 and Dec. 28, 1988.

Rehearing Denied Dec. 19, 1988.

Alan B. Foster, Asst. Gen. Counsel, Oklahoma Bar Assn, Oklahoma City, for complainant.

Lewis Barber, Jr., George P. Traviolia, Barber & Traviolia, Oklahoma City, for respondent.

Morris R. Bell, President, Oklahoma City Assn. of Black Lawyers, Oklahoma City, for amici curiae.

HARGRAVE, Vice Chief Justice.

Presently before the Court is a disciplinary matter brought against E. Melvin Porter upon a grievance filed by District Judge Ralph G. Thomspon. After a hearing the Professional Responsibility Trial Panel found that E. Melvin Porter violated the mandatory strictures of 5 O.S.A. Ch. I, App. 3 (1981), D.R. 1–102(A)(5), (6) providing:

"(A) A lawyer shall not:

. . . . .

(5) Engage in conduct that is prejudicial to the administration of justice.

(6) Engage in any other conduct that adversely reflects upon his fitness to practice law."

As disclosed by the evidence taken in the hearing before the Professional Responsibility Trial Panel, the finding of misconduct arises from statements made by respondent regarding United States District Judge Ralph G. Thompson. The comments were made immediately after the judge had presided over the trial and sentencing of respondent's client, Bernard J. McIntyre. The statements were made out

of court, in public, to the news media. Respondent admitted the comments were referable to the Judge.

> "He showed all the signs of being a racist" in addition to "I've never tried a case before him that I felt I got an impartial trial out of him."

> "He showed all the signs of being a racist during the trial. He never talked to me. He always talked to Mr. Gotcher. He only talked to me when he had to. And if he wants to practice his racism that way that's his business."

The complainant Bar Association called the respondent as its witness at the hearing on the complaint. During this testimony, respondent admitted making the statements. He also outlined his experiences as a trial lawyer before the judge. He stated that these experiences had led him to believe the remarks were justified. After calling respondent and introducing various exhibits, complainant rested its case. The respondent put on its case, calling one witness, John D. Berry, Executive Director of the Oklahoma County Bar Association, and rested without further testimony. Thereafter the complainant attempted to call rebuttal witnesses. These witnesses were offered to rebut evidence elicited from respondent when called to the stand to testify as the Bar Association's witness. After prolonged debate the trial panel ruled that complainant would not be allowed to put on witnesses to rebut the evidence given by Mr. Porter in the Bar's case-in-chief, nor would the entire case be reopened. On these two issues the panel's ruling appears in the record as follows:

> "... while you do have the right to offer rebuttal witnesses there are limitations with regard to what can be rebutted. The panel is going to hold that you would not be permitted to rebut evidence presented by Senator Porter who was called as your witness."

The Trial Panel cannot be held to have erred in refusing the offered rebuttal evidence. *Middlebrook v. Imler, Tenny and Kugler, M.D.s,* 713 P.2d 572 (Okl.1985):

> "... Rebuttal evidence is that class of evidence which has become relevant only by virtue of evidence *introduced* by the adverse party, and its function is to explain or repel evidence of the adverse party (citations omitted). In this instance, the offered testimony is not rebuttal matter for it has no relation to repelling evidence of the adverse party. (emphasis added)

During an extended discussion in the record, complainant's desire to reopen the case and the reasons for that need were discussed. The respondent pointed to the fact that its potential witnesses had been released by that time; in addition to the fact that postponing and resetting the hearing would work additional harm to the respondent's business affairs. The Trial Panel then ruled unanimously that the complainant's application to reopen should be denied. After reviewing the record we cannot say the tribunal abused its discretion in refusing to reopen, postpone the case, recall witnesses, and start the proceedings anew.

In testimony and by exhibits the respondent asserted in his defense that the remarks were truly descriptive of the official conduct of the district judge in question. The respondent also asserted he had been selectively prosecuted, that the complaint here considered violated his right to free speech under the First Amendment to the United States Constitution, that the disciplinary regulations at issue are vague and indefinite, and that respondent's rights under 42 U.S.C. § 1983 had been violated.

One trial master recommended the respondent be found innocent of all charges of misconduct. Two masters concurred in findings of fact and conclusions. Summarized, the findings and conclusions disclose the following: The respondent established by unrefuted evidence that he had subjectively formed an opinion based upon experiences which he perceived as providing him with a rational basis for having concluded that the remarks he made had a factual basis. Additionally, the two trial masters found the respondent exceeded the bounds of proper conduct for an attorney; that action subjects him to discipline under the code of professional responsibility, and the

respondent did not have the constitutional right to make these utterances. A member of the legal profession is subject to reasonable restraint in his professional behavior exceeding those which exist in respect to the general public. The trial masters also found that the respondent had not met his burden of demonstrating the affirmative defense of selective prosecution. They further found the regulations governing the matter imposed upon respondent a duty to uphold respect for the law, and respondent's actions were professionally indefensible whether or not he believed them to be supported by a factual basis. The respondent's actions are specifically prohibited and were known by respondent to be likely to bring discredit upon the courts of this state and nation and upon a jurist actively engaged in a well-publicized trial. These two masters additionally found the constitutionality of the restriction imposed by the disciplinary rules was beyond the purview of the Trial Panel.[1]

In the light of the findings the trial panel made individual recommendations. Trial master Don Simmons, the lay member, recommended that respondent be found innocent of all charges. Trial master Kenneth E. Holmes recommended that the respondent be suspended from the practice of law for a period of 60 days and that costs of the proceeding be taxed to the respondent. Trial master Darven L. Brown recommended that respondent receive a public censure and that costs of the proceeding be taxed against him.

The Bar Association recommended to the trial panel that the respondent receive a public censure. The complainant states in its brief to this Court that the respondent's refusal to demonstrate remorse for his actions warrants an order of suspension.

I

The Supreme Court of the State of Oklahoma has spoken to the question of an attorney's criticism of individuals holding judicial office. An examination of these cases leads to the conclusion that this Court has always looked at the nature of the accusation and has carefully avoided censuring attorneys for speech in the absence of a showing of falsity. In certain respects these opinions foreshadow constitutional interpretation established decades later. In the early case of *State Bar Commission v. Sullivan*, 35 Okl. 745, 131 P. 703 (1912), the State Bar Commission brought an original action for the disbarrment of P.M. Sullivan. There it was alleged that the defendant had been guilty of gross misconduct and violations of his duty and obligations as an attorney and counselor at law, in that he falsely, maliciously and without reasonable justification or excuse caused to be printed and published a pamphlet entitled "A Criminal Combine". This pamphlet described the Governor, Attorney General, the Supreme Court, district clerks, district attorneys and referees, as perjurers, murder plotters, and crooks galore. The pamphlet was published by the defendant for the purpose of giving vent to his personal malice to create an ill will and prejudice against the courts of this state and the judges thereof. Secondly, the defendant violated his duties as an attorney by filing a petition in the District Court of Oklahoma County in which he charged certain judges of Oklahoma and Cleveland Counties and the Supreme Court as well as the Governor and Attorney General were engaged in a conspiracy to judicially rob him of certain real estate. In conjunction therewith he charged them with robbery, bribery, perjury and numerous other offenses. It was charged the filing of this pleading was malicious and designed to slander and libel the defendants and bring contempt, ridicule and hatred to the courts of this state. The opinion notes an attorney may be disbarred for issuing out of court statements designed to willfully, purposely and maliciously misrepresent the courts and judges of the state, and bring them into disrepute, thereby lessening the respect due to them.[2] In reaching this conclusion, the Court recognized the effect

---

1. This finding is correctly noted.

2. This is the precept referred to in certain law references. See 12 A.L.R.3rd 1408 at 1431.

of the principles of freedom of speech on the case. The opinion recognizes the role of truth in assessing a violation of the duties of an attorney and counselor at law. The Court implicitly found that the statements made were untrue and expressly stated the statements were willfully and maliciously made to misrepresent the position of the courts. *State Bar Commission v. Sullivan, supra,* does not stand for the proposition that an attorney may be sanctioned for any out of court statement critical of the courts or an individual judge. The case states an attorney is liable to suffer the ultimate punishment of professional excommunication where false accusations are willfully made with the specific intent to misrepresent the position of the court, or bring the courts into disrespect and lessen the respect rightfully due them. The case also acknowledges the right of an attorney to criticise the court in situations which do not contain the elements of willful bad-faith falsehoods:

"... An attorney has a right to criticise the courts of this state, so long as his criticisms are made in good faith and in respectful language and with no design to willfully or maliciously misrepresent the postion of the courts, or tend to bring them into disrepute or lessen the respect due them. Is this publication a criticism? Certainly not. It is a willful, malicious, outrageous, and unwarranted attack upon the integrity of the courts of this state and the judges thereof, with the sole and only pupose of creating a feeling of ill will and prejudice against the courts of this state and lessening the respect due them. Freedom of speech is one of our boasted guaranties of liberty; but even this right should be curbed when the integrity of the courts are willfully and maliciously assailed. The court has the inherent right to protect itself from such malicious attacks, and we think the publication of this pamphlet by the defendant a willful violation of his duties as an attorney and counselor at law, in that it violates that part of his oath as an attorney which provides that he shall act in the ofice of an attorney according to his best learning and discretion, with all good fidelity as well to the court as to his client." 131 P. 703 at 707.

This Court's concern for the protection of the exercise of the rights of free speech is a thread that runs from an early time in this state in consideration of proceedings to discipline attorneys for remarks critical of the judiciary and those holding the judicial office. The law of Oklahoma has shown concern from the earliest times with the balance between a citizen's duties as an attorney and his right to speak freely on matters of public concern accorded to all people under our constitutional system of government. Thus one finds the Court examining questioned statements for false and malicious or bad-faith misstatements without explicitly stating the fact that falsity was a necessary showing prior to disciplining an attorney. The Court did provide for an attorney's right to speak the truth freely in *State v. Breckenridge,* 126 Okl. 86, 258 P. 744, at 747 (1927):

"The right of free speech and free discussion as to judicial determinations is of prime importance under our system and ideals of government. No right thinking man would concede for a moment that the best interest to private citizens, as well as to public officials, whether he labors in a judicial capacity or otherwise, would be served by denying this right of free speech to any individual. But such right does not have as its corollary that members of the bar who are sworn to act honestly and honorably both with their client and with the courts where justice is administered, if administered at all, could ever properly serve their client or the public good by designedly misstating the facts or carelessly asserting the law. Truth and honesty of purpose by members of the bar in such discussion is necessary. The health of a municipality is none the less impaired by a polluted water supply than is the health of the thought of a community toward the judiciary by the filthy, wanton, and malignant misuse of members of the bar of the confidence the public, through its duly established courts, has reposed in them to deal with the affairs of the pri-

vate individual, the protection of whose rights he lends his strength and money to maintain the judiciary of his country. For such conduct on the part of the members of the bar the law itself demands retribution—not the court."

The Court again examined the propriety of disciplining an attorney for remarks critical of the courts and judiciary in *State v. Nix*, 295 P.2d 286 (Okl.1956). There the Bar Association had enumerated three charges of misconduct. Two were held to be privileged utterances made on the Senate floor. The third incident was in a television interview. The Court said the remarks on television, although mostly of his comment or opinion, in places went beyond comment and amounted to a reflection on the named court. In determining that such conduct merited a public censure, the Court noted the absence of any showing in the record of justification. That absence of justification in this context referrable to the issue of factual support for the statement made:

"... The remarks under the circumstances were indiscreet, ill-advised and unbecoming, and under the facts as disclosed by the record in this case wholly unjustified, and the respondent is hereby censured and reproved for the statement made on the telecast." *State v. Nix, supra*, at 293.

In *State ex rel. Oklahoma Bar Association v. Grimes*, 436 P.2d 40 (1967), this Court also recognized that all criticisms of a court or judge do not constitute a violation of the duties and responsibilities of an attorney. Here again it is recognized that a disciplinary inquiry must concern itself with the issue of the factual basis for the criticism:

"This Court would be the last to deny that Respondent has the right to uphold the honor of the profession and expose without fear or favor corrupt or dishonest conduct in the profession, whether the conduct be that of a Judge or an attorney. However such charges should be specific and not general and should not be made unless one has specific fac-

tual proof thereof rather than supposition and hearsay."

The aforementioned cases dealing in part with the liability of an attorney for remarks critical of the courts or judiciary all recognize that the statements made were false, some to the point of being beyond credible belief.

## II

The parties now before the Court agree that the latest authority from the United States Supreme Court on this matter is *In Re Sawyer*, 360 U.S. 622, 79 S.Ct. 1376, 3 L.Ed.2d 1473 (1959). We note the existence of *In Re Snyder*, 472 U.S. 634, 105 S.Ct. 2874, 86 L.Ed.2d 504 (1985), as does respondent. Although that case presented the issue now before the Court, *Snyder*, was decided upon the facts without constitutional analysis. In *Sawyer*, the petitioner made a speech during the trial of an action in federal court. In that speech Sawyer referred to "horrible and shocking" things that occurred during the trial, stated a fair trial was impossible, and made other derogatory statements about the proceedings. For such conduct Sawyer was suspended for a year by the Supreme Court of the Territory of Hawaii, which was affirmed by the United States Court Of Appeals for the Ninth Circuit. The Supreme Court reversed with the Justices issuing separate opinions. Five members of the Court found the evidence insufficient to support the conclusion that the petitioner's speech impugned the integrity of the judge presiding at the trial. (The five Justices being Warren, C.J., Black, Douglas, Brennan and Stewart, JJ.) Brennan, J., announced the opinion of the Court in which the Chief Justice, Black and Douglas, JJ., joined. This opinion draws a distinction between criticism of the state of the law and attacks upon the integrity and competence of an individual judge. Additionally the opinion finds no distinction to be validly drawn between impugning the integrity of a judge or attacking his administration of justice either before or after the conclusion of the case. These conclusions are drawn from *In Re Sawyer, supra*, 360 U.S. at 631

and 632 and 635 and 636, 79 S.Ct. at 1380 and 1381 and 1382 and 1383 as follows:

"We start with the proposition that lawyers are free to criticise the state of the law. Many lawyers say that the rules of evidence relative to the admission of statements by those alleged to be co-conspirators are overbroad.... Others disagree. But all are free to express their views on these matters, and no one would say that this sort of criticism constituted an improper attack on the judges who enforced such rules and who presided at the trials. This is so, even though the existence of questionable rules of law might be said in a sense to produce unfair trials. Such criticism simply cannot be equated with an attack on the motivation or the integrity or the competence of the judges. And surely permissible criticism may as well be made to a lay audience as to a professional; oftentimes the law is modified through popular criticism; ..."

"But it is said that while it may be proper for an attorney to say the law is unfair or that judges are in error as a general matter, it is wrong for counsel of record to say so during a pending case. The verbalization is that it is impermissible to litigate by day and castigate by night. See [*In re Sawyer,*] 260 F.2d, [189] at 202 [ (9th Cir.1958) ]. This line seems central to the Bar Association's argument, as it appears to have been to the reasoning of the court below, and the dissent here is much informed by it, but to us it seems totally to ignore the charges made and the findings. The findings were that petitioner impugned the integrity of Judge Wiig and made an improper attack on his administration of justice in the Honolulu trial. A lawyer does not acquire any license to do these things by not being presently engaged in a case. They are equally serious whether he currently is engaged in litigation before the judge or not. We can perceive no ground whereby the pendency of litigation might be thought to make an attorney's out-of-court remarks more censurable, other than they might tend to obstruct the administration of justice.

Remarks made during the course of a trial might tend to such obstruction where remarks made afterwards would not.... Judge Wiig remained equally protected from statements impugning him, and petitioner remained equally free to make critical statements that did not cross that line...."

 Two precepts are drawn from these excerpts that are worthy of further consideration. The first is that an attorney is free to criticise the institution of the law in this country or the wisdom and efficacy of the rules of law which control the exercise of judicial power. Contrarily, criticism by an attorney amounting to an attack on the motivation, integrity or competence of a judge whose responsibility it is to administer the law may be under certain circumstances properly censurable. There is a certain unresolved tension between this teaching and the precepts first discussed five years after *Sawyer, supra,* in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). *New York Times Co. v. Sullivan, supra,* and the line of cases flowing therefrom, it would seem, places rather less stress upon the social utility of shielding a public official from criticism than is evident in *Sawyer, supra,* and more emphasis upon preservation of the integrity of the institution rather than the personality occupying that office.

The United States Supreme Court was faced with this same issue in the case of *In Re Snyder, supra.* In this action attorney Snyder had been suspended from the practice of law in the federal court for the Eighth Circuit for six months for a statement made out of court in a letter to the staff of a district judge which was deemed disrespectful by the Chief Judge of the United States Court of Appeals for the Eighth Circuit. In full, the letter reads as follows:

"In the first place, I am appalled by the amount of money which the federal court pays for indigent criminal defense work. The reason that so few attorneys in Bismarck accept this work is for that exact reason. We have, up to this point, still

accepted the indigent appointments, because of a duty to our profession, and the fact that nobody else will do it.

Now, however, not only are we paid an amount of money which does not even cover our overhead, but we have to go through extreme gymnastics even to receive the puny amounts which the federal courts authorize for this work. We have sent you everything we have concerning our representation, and I am not sending you anything else. You can take it or leave it.

Further, I am extremely disgusted by the treatment of us by the Eighth Circuit in this case, and you are instructed to remove my name from the list of attorneys who will accept criminal indigent defense work. I have simply had it.

Thank you for your time and attention." 472 U.S. at 637, 105 S.Ct. at 2877.

The Eighth Circuit had determined that this letter in conjunction with an unspecified refusal to show continuing respect for the court demonstrated conduct prejudicial to the administration of justice. North Dakota Code of Professional Responsibility, D.R. 1–102(A)(5) and the American Bar Association Model Code of Professional Responsibility (1980), D.R. 1–102(A)(5). The Supreme Court found it unnecessary to examine the free speech issue tendered, and held that criticism of the administration of the Criminal Justice Act was not cause for discipline or suspension. In reference to the concededly harsh tone of the letter the Court said:

"... a single incident of rudeness or lack of professional courtesy—in the context here—does not support a finding of contemptous or contumacious conduct, or a finding that a lawyer is not presently fit to practice law in the federal courts; nor does it rise to the level of 'conduct unbecoming a member of the bar' warranting suspension from practice."

In the related area of conflict between Bar regulations' infringement of an attorney's right to free speech of a commercial character the United States Supreme Court has clearly spoken. Although speech proposing a commercial transaction is afforded First Amendment protection somewhat less extensive than non-commercial speech, an attorney may not be disciplined for soliciting legal business through printed advertising containing truthful and non-deceptive information—commercial speech, not false, deceptive, or concerning illegal activities may be restricted only in the service of substantial governmental interest and only through means that directly advance that intent. *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985), *In Re R.M.J.*, 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982), *In Re Primus*, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978), *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). Pure speech is entitled to no less protection than this.

### III

The expressive activity which forms the basis of this proceeding is the class of expressive activity which the First Amendment is designed to protect. Aside from the fact that the speaker is here an attorney, this expressive activity stands at the epicenter of those expressive activities protected by the First Amendment. There is practically universal agreement that a major purpose of the First Amendment is to protect the free discussion of governmental affairs. *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), *Mills v. Alabama*, 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966).

"The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." *Thornhill v. Alabama*, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

The speech activity for which respondent is called to answer for here is plainly at the center of the protective umbrella of the First Amendment. Freedom of speech,

press, assembly and the right to petition the government for a redress of grievances share a common core purpose of assuring freedom of communication on matters relating to the functioning of government. *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980):

"... Plainly it would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted; ..." *Richmond, supra,* at 448 U.S. 575 [100 S.Ct. 2826].

■ The regulation sought to be upheld by this proceeding prohibits a certain class of citizens, attorneys, from speaking on certain subjects, criticism of the judiciary. This concern with limiting what subjects may be spoken to by which speakers is absolutely inimical to the principles of the First Amendment. In the realm of protected speech, the government is constitutionally disqualified from dictating the subject about which persons may speak and the speakers who may address a public issue. *First National Bank of Boston v. Bellotti, supra, Police Department v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

■ The inquiry here made must also take into account rights other than the right of the speaker to communicate. The counterpoint to the right to speak is the right of the listener to receive a free flow of information. The First Amendment goes beyond protection of the press and individual self-expression to prohibit the government from limiting the stock of information from which members of the public may draw. *First National Bank of Boston v. Bellotti, supra. State ex rel. Department of Transportation v. Pile,* 603 P.2d 337 (1979), cert. denied 453 U.S. 922, 101 S.Ct. 3158, 69 L.Ed.2d 1004 (1981). This concomitant right to receive information has been referred to as a freedom to listen. The freedom of speech necessarily protects the right to receive that information. *Martin v. City of Struthers,* 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943), *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct.

1234, 22 L.Ed.2d 542 (1969). It is well established that the constitution protects the right to receive information and ideas. The right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences is crucial, for it is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail. *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

■ Foreclosing the right of an attorney to criticise the court is thus not only a burden on the speaker's First Amendment right but also upon the public's First Amendment right to hear what he has to say. Without question, foreclosing the public's receipt of speech concerning the governmental function of the courts forestalls the public's access to the thoughts of the very class of people in daily contact with the judicial system.

The regulation here examined, if applied to this expressive activity, clearly strikes at the center of the concerns of the First Amendment freedoms by prohibiting attorney's criticism of the workings of the judiciary. In so doing, the regulation would directly inhibit the public's right to receive this information from those who under ordinary circumstances are most calculated to be intimately familiar with this aspect of the government process.

■ It can only be concluded the First Amendment is clearly offended by such a restriction on the free exchange of information pertinent to the functioning of government embodied by this prohibition of attorney criticism. Thus, utilization of disciplinary rules to sanction the speech here in question is a significant impairment of First Amendment rights. Where, as here, a prohibition is directed at speech itself, and the speech is ultimately related to the process of self government, the state may prevail only upon showing a subordinating interest which is compelling. *First National Bank of Boston v. Bellotti, supra, Bates v. Little Rock,* 361 U.S. 516, 80 S.Ct.

412, 4 L.Ed.2d 480 (1960). The means chosen to further this intention, if compelling, still must be narrowly tailored to avoid unnecessary abridgement of the right of free speech. *First National Bank of Boston v. Bellotti, supra, Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

■ The analysis used to weigh an offered compelling interest that would justify a significant impairment of the First Amendment is outlined in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).[3] In summary, that analysis shows a significant impairment of First Amendment rights must survive exacting scrutiny, even if the impairment arises indirectly from the questioned regulation. A mere showing of state interest is insufficient; the interest must be paramount, of vital importance, and the burden is on the government to show its existence. Further it is not enough to show a rational relationship between the means chosen and the end sought to be accomplished. The advance of the subordinating interest must outweigh the loss of protected rights and the government must employ means closely drawn to avoid unnecessary abridgement. If the state has open to it a less drastic method of satisfying its legitimate interest it may not validly choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties. *Elrod v. Burns, supra,* 427 U.S. at 362 through 363, 96 S.Ct. at 2684 through 2685.

■ The detriment caused by this disciplinary rule to protected rights, visited upon the attorney speaking on issues regarding governmental affairs is substantial, although personal. However, the public at large also experiences curtailment of its First Amendment privileges. Through application of this rule the public is deprived of its right to receive information about the workings of its governmental functionaries from those precisely situated to be ultimately familiar with the operation of the judicial branch of government. The right of the public to receive this information occupies a critical citadel of the First Amendment rights. We have not been shown, nor can we at present conceive, of an interest sufficiently imperative to justify such a restriction of core First Amendment rights, at least where the statements made are not shown to be incorrect statements of fact. In the record before this Court no evidence was introduced to demonstrate that the statements were false or that they were insincerely uttered by a speaker having no basis upon which to found them.

The review made above of disciplinary actions in this Court from the early days of statehood have shown a concern for the rights of an attorney to criticise judicial action. In each there has been a showing that the statements made were untrue or outrageous to the point of demonstrating within their four corners that they were wholly improbable and plainly false. The historic care taken by this Court to ensure that attorney discipline not exercise a chilling effect on First Amendment rights is wholly in keeping with the spirit of the later federal line of authority eminating from *New York Times Co. v. Sullivan, supra.*

We agree that the attorney's personal First Amendment rights might properly be subordinated to the attorney's duties as officers of the courts. Such a consideration does nothing to weigh in the balance against the right of the public generally to be informed of the affairs of their government. In keeping with the high trust placed in this Court by the people, we cannot shield the judiciary from the critique of that portion of the public most perfectly situated to advance knowledgeable criticism, while at the same time subjecting the

---

**3.** The Court's plurality opinion was joined by Marshall and White, JJ., written by Justice Brennan, Chief Justice Burger, and Justice Rehnquist joined Justice Powell dissenting in an opinion that approves the plurality opinion's analysis of the mechanics of determining whether the burden imposed on the First Amendment is justified by sufficiently important state interests. 427 U.S. at 381, 96 S.Ct. at 2693.

balance of government officials to the stringent requirements of the *New York Times Co. v. Sullivan, supra,* and its progeny.

 False speech does not foster First Amendment protection, *Time v. Pape,* 401 U.S. 1015, 91 S.Ct. 1248, 28 L.Ed.2d 552 (1971), because there is no constitutional value in false statements of fact. *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). See also, *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). There is no First Amendment protection afforded remarks critical of the judiciary when those statements are false. The state has an interest in suppressing false statements of fact referenced to the judiciary originating from members of the Bar. Disseminating false statements of fact in reference to the judiciary can be prejudicial to the administration of justice and is properly a subject for discipline under D.R. 1–102(A)(5). Misinformation from the Bar is detrimental to the public weal for the same reason that the access to information from that source may not be impeded. Members of the Bar possess, and are perceived by the public as possessing, special knowledge of the workings of the judicial branch of government. Critical remarks from the Bar thus have more impact on the judgment of the citizen than similar remarks by a layman would be calculated to have.

We are not faced here with an issue of falsity. The three trial masters found that the respondent had a rational basis for having concluded that the remarks had a factual basis. The two trial masters determining that discipline should be imposed held: "That respondent established by unrefuted evidence that he had subjectively formed an opinion based upon experiences which he perceived and interpreted to have provided him with a rational basis for having concluded that the remarks which he attributed to the jurist had a factual basis." The remaining member of the trial panel,

Don Simmons, the lay member of the trial panel stated in his first finding and conclusion:

"The overriding fact for me is Respondent absolutely believed beyond a shadow of a doubt he had a rational basis for concluding that his remarks about the Jurist had a factual basis." [4]

There is no First Amendment protection for false statements of fact. A statement shown to be false therefore subjects an attorney to disciplinary sanctions. Although not precisely raised by the record before the Court, it is proper to note that the considerations which dictate that First Amendment protection be afforded to ultimately false statements shown to be made in good faith such as in *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), face a differing analysis in this context. The First Amendment protection afforded attorney criticism of the judiciary here is not based on the attorney's right to communicate freely. Here the First Amendment consideration held to be paramount is the public's right to receive information from a class of persons most intimately familiar with the administration of the judiciary. False information emanating from that source is inimical to the same extent that true information from the Bar on the subject benefits society. The public has a right to expect that attorneys be held to stringent standards when divulging information and commenting on legal affairs touching upon issues of self government.

The record is devoid of any attempt to show that the statements complained of are false. In the absence of a showing of falsity the statement must be held to be speech on vital issues of self government protected by the First Amendment. We thus hold that D.R. 1–102(A)(5)(6) cannot be construed to sanction the expressive activity before the Court. Similarly discipline under 5 O.S.A. Ch. I, App. 3 (1981), D.R. 8–102(B) is not warranted by virtue of the absence of any showing of falsity.

**4.** Trial master Simmons recommended "this respondent be found innocent of all charges" immediately after this statement in his written report: "The preservation of a viable democracy sometimes necessitates the tolerance of public criticism of both institutions and high public officials."

## IV

At this point it is necessary to remind the profession that First Amendment license to comment is broader than the traditional correct demeanor expected of an officer of the court. Nothing said in this opinion changes those expectations. Remarks of the sort being now considered are indeed disrespectful, exhibiting a definite lack of the polish expected of the true professional and they remain uncondoned. It is expected that counselors will maintain the honor of the profession and the decorum properly expected of an officer of this court. Nothing less than precisely proper decorum and conduct is expected by this Court of members of the Bar. We view the remarks here examined to be extremely bad form while in the same breath we hold them to be protected. Each member of the Bar should remember that as an attorney, all have sworn: "... to act in the office of attorney of this Court according to best learning and discretion, and with all good fidelity as well to the court and to client." [5]

Therefore it should be a personal point of honor for each attorney to keep faith with himself and the oath he has taken, cognizant of the fact that one's own word and professional pride should be a sufficient principle upon which to base one's conduct.

IMPOSITION OF DISCIPLINE DENIED.

DOOLIN, C.J., and LAVENDER, ALMA WILSON and KAUGER, JJ., concur.

HODGES, SIMMS and OPALA, JJ., concur in judgment.

OPALA, Justice, concurring in judgment.

I concur in today's opinion only insofar as it holds that the respondent may not be disciplined for constitutionally protected utterances that fall under the rubric of political speech. See in this connection, *In re Snyder*, 472 U.S. 634, 646–647, 105 S.Ct. 2874, 2882, 86 L.Ed.2d 504 [1985] and Comment, *The First Amendment and Attorney Discipline for Criticism of the Judiciary: Let the Lawyer Beware*, 15 N.Ky.L.

Rev. 129 [1988]. Even if, after an initial rejection of its evidence—a ruling I deem correct—the Bar had followed up with a formal and particularized offer to prove that the respondent's remarks were false in fact, no discipline would be imposable here. Respondent's constitutional freedom of speech does not depend on the truth of its content.

---

5. From 5 O.S. 1981 § 2, as appearing on the Oklahoma attorney's license to practice.